UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ORGANIC CONSUMERS ASSOCIATION, *et al.*,<br><br>     Plaintiffs,<br><br>    v.<br><br>GENERAL MILLS, INC.,<br><br>     Defendant. | Civil Action No. 1:16-cv-1921-ESH |

**MEMORANDUM OPINION**

Plaintiffs Organic Consumers Association, Moms Across America, and Beyond Pesticides ("Plaintiffs") bring this action against defendant General Mills, Inc. ("General Mills"), alleging that defendant's labeling and advertising of its "Nature Valley" granola products as "natural," "healthy," "100% Natural," or "Made with 100% Natural Whole Grain Oats" violates the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*. because the products contain glyphosate, a chemical pesticide. Plaintiffs originally filed their complaint in the Superior Court of the District of Columbia. After defendant removed the case to federal court, claiming federal question jurisdiction, plaintiffs filed the pending motion to remand. For the reasons stated herein, the motion to remand will be granted.

**BACKGROUND**

Defendant General Mills produces, markets and sells a line of granola products under the name "Nature Valley" (hereinafter "Nature Valley Products").[1] The Nature Valley Products are

---

[1] The complaint specifically identifies the following Nature Valley Products as within its scope:

labeled and/or promoted as "Made with 100% Natural Whole Grain Oats," "100% Natural," "natural," and/or "healthy." (Compl. ¶¶ 3, 137.)

Plaintiffs take issue with these descriptors because Nature Valley Products contain glyphosate.[2] (Compl. ¶¶ 7, 9.) Glyphosate is a chemical pesticide that is marketed under the trade name "Roundup." (Compl. ¶ 82.) It is routinely sprayed on a host of crops, including oats, as a desiccant – to dry them out for faster harvesting and better yields. (Compl. ¶ 84-85.) It is also, according to plaintiffs, potentially damaging to human health in a variety of ways. (Compl. ¶¶ 88-97, 103.) Accordingly, the complaint alleges, glyphosate is neither "natural" nor "healthy" (Compl. ¶¶ 79, 100), and it is false, deceptive and misleading to describe Nature Valley Products containing glyphosate as such. (*See, e.g.*, Compl. ¶¶ 4, 14, 79, 109.)

Plaintiffs' complaint includes one claim under the DCCPPA: that General Mills' labeling and advertising of Nature Valley Products containing glyphosate as "natural," "healthy," "100% Natural," or "Made with 100% Natural Whole Grain Oats" violates the statute because it "misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard,

---

a. Crunchy granola bars (Oats 'n Honey, Peanut Butter, Maple Brown Sugar, Vanilla Almond Nut & Seed, Coconut, Pecan, and other varieties);
b. Trail Mix chewy granola bars (Fruit & Nut, Dark Chocolate & nut, and other varieties);
c. Sweet & Salty Nut granola bars (Peanut, Almond, and other varieties);
d. Breakfast Biscuits (Honey, Blueberry, Lemon Poppy Seed, and other varieties);
e. Biscuits (with Almond Butter, with Peanut Butter, and other varieties);
f. Oatmeal Squares (Blueberry, Peanut Butter, Cinnamon Brown Sugar, Banana Bread & Dark Chocolate, and other varieties);
g. Oatmeal Bars (Peanut Butter, Cinnamon Brown Sugar, and other varieties); and
h. Oatmeal Bistro Cups (Brown Sugar Pecan, Apple Cinnamon Almond, and other varieties).

(Compl. ¶ 6.)

[2] The complaint alleges that the exact source of the glyphosate is unknown, but suggests that "the oats are most likely the source" because glyphosate is used on oat crops "to dry them and produce an earlier, more uniform harvest." (Compl. ¶ 9 & n.2)

quality, and grade" of these products.[3]  (Compl. ¶¶ 137-38).  They seek declaratory and injunctive relief.  (Compl. at 25.)

Pursuant to 28 U.S.C. §§ 1441 and 1446(b), defendant timely removed this case to federal court,[4] asserting that even though the only legal claim in the complaint is an alleged violation of the DCCPPA, there is federal question jurisdiction under 28 U.S.C. § 1331 because plaintiffs' "right to relief necessarily depends on the resolution of a substantial question of federal law, specifically, the determination of whether certain food products are adulterated, unsafe, and mislabeled due to the alleged presence of a chemical pesticide residue, a matter governed by a comprehensive, uniform national regulatory scheme promulgated under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*" (Notice of Removal ¶ 2.) Plaintiffs dispute the existence of federal question jurisdiction and have moved to remand the case to Superior Court.  (Pls.' Mot. to Remand, ECF No. 8 ("Mot.").)  Defendant opposes the motion to remand.  (Def.'s Resp. to Mot. to Remand, ECF No. 13 ("Resp.").)

## ANALYSIS

### I. STANDARD OF REVIEW

A party may remove a case from state to federal court only when the case could have been filed in federal court originally.  *See* 28 U.S.C. § 1441(a).  "When the plaintiff files a motion to remand, the defendant bears the burden of proving federal jurisdiction." *US Airways Master Exec., Council. v. Am. W. Master Exec., Council*, 525 F. Supp. 2d 127, 132 (D.D.C. 2007) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be

---

[3] Plaintiffs are proceeding under the private attorneys general provision of the DCCPPA, D.C. Code § 28-3905(k)(1).  (Compl. ¶¶ 44.)

[4] Defendant was served with the complaint on September 9, 2016, and filed its notice of removal on September 28, 2016, within thirty days of service as required by 28 U.S.C. § 1446(b).  (*See* Notice of Removal ¶ 4.)

presumed that a cause lies outside th[e] limited jurisdiction [of federal courts] and the burden of establishing the contrary rests upon the party asserting jurisdiction.")). "Any doubts about the existence of subject-matter jurisdiction are to be resolved in favor of remand." *Id*.

## II. FEDERAL QUESTION JURISDICTION

Federal courts have "federal question jurisdiction" over matters "arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331. The "vast majority" of federal question jurisdiction cases "are those in which federal law creates the cause of action." *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986); *see also Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) ("As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim.").

Where a complaint affirmatively alleges only state law claims, federal question jurisdiction rarely exists. One situation, seldom encountered, is "[w]hen a federal statute wholly displaces the state-law cause of action," meaning that "the federal statutes at issue provided the exclusive cause of action" and "set forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). The other possibility is when a state-law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005)[5]; *see also Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013)

---

[5] Before *Grable*, the Supreme Court had suggested a different test -- "[t]he general rule is that, where it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has [federal question] jurisdiction." *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 201 (1921). However, in *Grable*, the Court concluded that the test in *Smith* was a "somewhat generous statement of the scope of the doctrine." *See Grable*, 545 U.S. at 312.

("[F]ederal jurisdiction over a state law claim [under 28 U.S.C. § 1331] will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.").

It is a "special and small category" of cases that will belong in federal court under *Grable*. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006). The Supreme Court cautioned in *Grable* that the mere existence of a "federal issue" cannot be treated "as a password opening federal courts to any state action embracing a point of federal law." *Grable*, 545 U.S. at 314. In *Grable*, for example, plaintiff filed suit in state court to quiet title to a piece of real property, which the IRS had seized to satisfy plaintiff's federal tax delinquency and then sold it to defendant. Plaintiff contended that defendant's title was invalid because the IRS had failed to give proper notice of its seizure of the property as defined by federal law. The Supreme Court concluded that there was federal question jurisdiction, explaining that: "[w]hether Grable was given notice within the meaning of the federal statute is thus *an essential element of its quiet title claim*, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case." *Grable*, 545 U.S. at 315 (emphasis added). Similarly, in *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), the "classic example" of this type of jurisdiction, *Grable*, 545 U.S. at 312, the plaintiff's state law claim challenging a bank's investment in federal farm loan bonds was premised on the alleged unconstitutionality of an act of Congress.[6] *See Smith*, 255 U.S. at 201 ("no other reason is set

---

[6] In *Smith*, plaintiff was a bank shareholder seeking to enjoin a bank from investing in farm loan bonds issued by Federal Land Banks under the authority of the Federal Farm Loan Act of July 17, 1916. *Smith*, 255 U.S. at 195-96. Although plaintiff's claim was based on state law, which provided that the bank was "authorized to invest its funds in legal securities only," its "attack upon the proposed investment in the bonds described is because of the alleged unconstitutionality of the acts of Congress undertaking to organize the banks and authorize the issuance of the bonds." *Id*. at 199.

forth . . . as a ground of objection to the proposed investment" other than the allegation "that the securities were issued under an unconstitutional law, and hence of no validity").  In addition, it remains the case that a "federal defense, including the defense of preemption," does not suffice to create federal question jurisdiction.  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987); *see also Becker v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 770 F.3d 944, 947–49 (10th Cir. 2014) (where "federal issues are merely federal defenses," they "do not give rise to federal question jurisdiction" under *Grable*).

**III.   MOTION TO REMAND**

Defendant asserts that there is federal question jurisdiction under *Grable* because plaintiffs' claim "implicates" or "calls for the application of" federal regulations that pertain to (1) the safety of glyphosate; (2) food labeling requirements; and (3) definitions of the terms "healthy" and "natural."  (Resp. at 9-13.)  As explained *infra*, plaintiffs' claim may "implicate" these regulations, but it does not create any "federal issues" within the meaning of *Grable* because the issues are not "necessarily raised" by plaintiffs' DCCPPA claim.  At most, the federal regulations are potentially relevant as a defense, but that does not provide federal question jurisdiction.

### A.   Regulations Pertaining to the Safety of Glyphosate

Defendant's first *Grable* argument is based on federal regulations pertaining to the safety of chemical pesticides, including glyphosate.

Under federal law, the EPA Administrator may set a "tolerance level" for a pesticide chemical residue if the pesticide is determined to be "safe" at that level.  21 U.S.C. § 346(b)(2)(A)(i). "[T]he term safe [in this context] means that the Administrator has determined that there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for

which there is reliable information." 21 U.S.C. § 346a(b)(2)(A)(ii). A food is deemed "unsafe" and "adulterated" if the pesticide chemical residue exceeds the established tolerance level, and it may not be moved in interstate commerce. 21 U.S.C. § 342(a)(2)(B)[7]; *see also Natural Resources Defense Council v. Johnson*, 461 F.3d 164, 167 (2d Cir. 2006).

The EPA Administrator has established tolerance levels for glyphosate residues. *See* 40 C.F.R. § 180.364. With respect to oats, the alleged source of the glyphosate in Nature Valley Products, the tolerance level is 30 parts per million (ppm). *Id.*; *see also* 40 C.F.R. § 180.41(24) (crop group tables).

Defendant contends that plaintiffs' claim "necessarily implicates" these regulations because in order for plaintiffs to prove that it violates the DCCPPA to describe a food containing glyphosate as "healthy," they will have to show that any amount of glyphosate is "unsafe," which amounts to a "direct challenge" to the federally-established tolerance level. (Resp. at 10 (the "underlying assertion" to plaintiffs' challenge to the use of the term "healthy" is that "trace amounts of glyphosate are unsafe"). Defendant's argument is not persuasive. First, even though the complaint does allege that glyphosate at any level is unsafe for human consumption (*see, e.g.*, Compl. ¶¶ 110, 129), that allegation is not essential to plaintiffs' challenge to the use of the term "healthy." "Healthy" and "safe" are not synonymous. "Healthy," in this context, means "beneficial to one's physical state," while "safe" means "free from harm or risk." Merriam-

---

[7] 21 U.S.C. § 342(a)(2)(B) provides that "[a] food shall be deemed to be adulterated--. . . (B) if it bears or contains a pesticide chemical residue that is unsafe within the meaning of [21 U.S.C.] section 346a(a) of this title." Section 346a(a) states: "Any pesticide chemical residue in or on a food shall be deemed unsafe for the purpose of [21 U.S.C.] section 342(a)(2)(B) of this title unless--(A) a *tolerance* for such pesticide chemical residue in or on such food is in effect under this section and the quantity of the residue is within the limits of the tolerance; or (B) an *exemption* from the requirement of a tolerance is in effect under this section for the pesticide chemical residue." 21 U.S.C. § 346a(a).

Webster Dictionary; *see also* 21 U.S.C. § 346a(b)(ii) (defining "safe" as "a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue"); 21 U.S.C. § 101.65(d)(2) (establishing parameters for use of the term "healthy" "as an implied nutrient content claim on the label or in labeling of a food that is useful in creating a diet that is consistent with dietary recommendations"). Thus, plaintiffs' claim does not depend on the allegation that glyphosate is unsafe, and it does not "necessarily" raise an issue as to the safety of glyphosate. *See also* Memorandum in Support of Defendant General Mills, Inc.'s Motion to Dismiss the Consolidated Class Action Complaint at 31, *In re: General Mills Glyphosate Litigation*, No. 16-cv-02869 (D. Minn. Feb. 8, 2017) ("Minnesota Mot. to Dismiss") (in virtually identical case, General Mills has moved "to strike all allegations related to the safety of glyphosate as immaterial").

Second, even if plaintiffs' claim required them to prove that any amount of glyphosate in or on food is unsafe, they cannot directly challenge the "validity" of the federal tolerance level. *See* 21 U.S.C. § 346a(h)(1) (judicial review of pesticide tolerance levels is available via a petition filed in federal court within 60 days after publication of the regulation). Rather, the federal tolerance level can only be raised by defendant as a defense to any allegation that glyphosate is unsafe. *See, e.g.*, Minnesota Mot. to Dismiss at 31-32 (arguing in a motion to dismiss that federal tolerance levels preempt any claim that glyphosate amounts below that level are unsafe). But under those circumstances, the federal issue is a federal defense, and it does not give rise to federal question jurisdiction under *Grable*.

Accordingly, the Court concludes that plaintiffs' claim does not implicate federal regulations pertaining to the safety of glyphosate so as to raise a federal question under *Grable*.

### B.     Regulations Pertaining to Food Labeling Requirements

Defendant's second *Grable* argument is based on federal regulations pertaining to food

labeling requirements.

Under federal law, food labels are required to disclose many things to avoid being considered "misbranded" under federal law, but pesticide chemical residues are not among them. *See* 21 U.S.C. §§ 321(s), 343; 21 C.F.R. § 101.100(a)(3); *see also* Labeling of Genetically Modified Foods: Legal and Scientific Issues, 12 Geo. Int'l Envtl. L. Rev. 717, 740–43 (2000) (setting forth history that "led to the establishment of a regulatory scheme in which pesticide residues must be within the limits of safe tolerances, or exempt from such tolerances . . . but no disclosure of pesticide residues in labeling of either raw or processed foods is required at the retail level"). Accordingly, the failure to disclose a pesticide chemical residue on a food label does not render the food "misbranded" under federal law. *See* 21 U.S.C. §§ 343, 346a.

Defendant argues that plaintiffs' claim will require a court to "assess the meaning and effect" of these federal regulations because the complaint alleges that "General Mills labels are misleading because they omit disclosing the presence and dangers of glyphosate." (Resp. at 11.) The Court disagrees. Although the complaint includes these allegations, plaintiffs' legal claim is that it is the undisclosed presence of glyphosate in conjunction with labels or advertisements of the products as "natural" and "healthy" that violates the DCCPPA. That claim does not require the application of existing federal disclosure regulations. Moreover, even if plaintiffs' claim were based entirely on defendant's failure to disclose the presence of glyphosate, the fact that federal regulations do not require disclosure would be a defense, not a basis for *Grable* jurisdiction.

Accordingly, the Court concludes that plaintiffs' claim does not implicate federal regulations pertaining to food labeling in a manner that raises a federal question under *Grable*.

### C.     Regulations Pertaining to the Terms "Healthy" and "Natural"

Defendant's final *Grable* argument is that plaintiffs' claim calls for the "application of

existing federal law concerning the use of th[e] terms" "healthy" and "natural." (Resp. at 12.) Although defendant presents this as a single "federal issue," the terms "healthy" and "natural" have been regulated differently, so the Court will consider them independently.

### 1. "Healthy"

Defendant argues that plaintiffs' challenge to its use of the term "healthy" will require application of federal law because "the FDA's food labeling regulations already define and regulate the term 'healthy' to prevent 'misbranding,'" and because "the agency is currently considering whether to revise the rules governing the use of the term 'healthy' (including whether it can be used in a 'false or misleading' manner)." (Resp. at 12 (quoting 21 C.F.R. § 101.65(d)(2) and 81 Fed. Reg. 66562-01, 2016 WL 5391163 (Sept. 28, 2016) ("Use of the Term "Healthy" in the Labeling of Human Food Products; Request for Information and Comments")).)

There are several problems with defendant's analysis. First, the regulation it cites is much narrower than the description implies. It does not generally define and regulate the meaning of the term "healthy"; rather it sets the conditions under which that term (and related terms) can be used as part of an "implied nutrient content claim" on a food label. But plaintiffs are not challenging General Mills' use of the term "healthy" as part of an "implied nutrient content claim." An "implied nutrient content claim" is a claim that:

> (i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or

> (ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat").

21 C.F.R. § 101.13(b)(2).[8][9] As to this type of claim, FDA regulations provide that one "may use the term "healthy" or related terms (e.g., "health," "healthful," "healthfully," "healthfulness," "healthier," "healthiest," "healthily," and "healthiness")" only if the food "meets [certain specified] conditions for fat, saturated fat, cholesterol, and other nutrients."[10] 21 C.F. R. § 101.65(d)(2). The complaint does not allege that General Mills used the term "healthy" as part of an implied nutrient claim or even on a food label. Rather, it alleges that the term was used to describe Nature Valley Product on websites. (*See* Compl. ¶ 57 (allegations that it states on the General Mills' website that "People who eat whole grains as part of a *healthy* diet have a reduced risk of some chronic diseases."); Compl. ¶ 67 (allegation that "Several retailer websites extol the purported health benefits of the [Nature Valley] Products: 'It's not only wholesome but also healthy and makes snack time a lot of fun.'"). Thus, plaintiffs' claim does not implicate this regulation.

Second, even if there were a more direct conflict between the federal regulation and plaintiffs' claim, the regulation would be a defense, not a basis for federal question jurisdiction under *Grable*.

Finally, while it is true that the FDA is now seeking comments on whether it should

---

[8] A "nutrient content claim" is "[a] claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under [21 C.F.R.] § 101.9." 21 C.F.R. § 101.13.

[9] "An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., "low sodium" or "contains 100 calories." 21 C.F.R. § 101.13(b)(1).

[10] "The conditions include specific criteria for nutrients to limit in the diet, such as total fat, saturated fat, cholesterol, sodium, as well as requirements for nutrients to encourage in the diet, including vitamin A, vitamin C, calcium, iron, protein, and fiber. The criteria are linked to elements in the Nutrition Facts label and serving size regulations (see 21 C.F.R. § 101.9 and 101.12). The nutrient criteria to use this nutrient content claim can vary for different food categories (e.g., fruits and vegetables, or seafood and game meat) (21 C.F.R. § 101.65(d)(2))."

regulate the use of the term "healthy" outside the "nutrient content" context, the possibility of future regulation does not satisfy the *Grable* test for federal question jurisdiction.

### 2. "Natural"

Defendant argues that plaintiffs' challenge to the use of the term "natural" will require the application of federal law because the FDA has an "informal policy" about what the term means and it is "now considering whether to revise its policy regarding the use of the term 'natural,' including whether it can be used where pesticides have been used in the production process." (Resp. at 12-13 (citing 80 Fed. Reg. 69905, 69908, 2015 WL 6958210 (Nov. 12, 2015) ("Use of the Term 'Natural' in the Labeling of Human Food Products; Request for Information and Comments")).) The Court disagrees.

The FDA has never "establish[ed] a definition for the term 'natural' when used in food labeling," but its "longstanding policy" is "not . . . to restrict the use of the term 'natural' except for added color, synthetic substances, and flavors," and to interpret the term "to mean that 'nothing artificial or synthetic (including all colors regardless of source) has been included in, or has been added to, the product that would not normally be expected to be there." 80 Fed. Reg. 69905-01, 69906, 2015 WL 6958210 (citing 56 Fed. Reg. 60421, 60426).

It is not clear that plaintiffs' challenge to defendant's use of the term "natural" actually conflicts with the FDA's informal policy, as the FDA admits that its policy "was not intended to address . . . the use of pesticides . . . ." *Id.* at 69906; *see also id.* at 69908 ("If we were to revise our policy regarding the use of the term 'natural' or engage in rulemaking to establish a regulatory definition for "natural," should certain production practices used in agriculture, for example, . . . the use of pesticides . . . be a factor in defining "natural?" Why or why not?"). In addition, to the extent there is an arguable conflict between plaintiffs' claim and the FDA's informal policy, and assuming *arguendo* that an informal policy has legal significance, the

"federal issue" is really just a "federal defense," not a basis for federal question jurisdiction under *Grable*. Finally, just as with the term "healthy," the fact that the FDA is contemplating future regulation does not raise a federal issue within the meaning of *Grable*.

Accordingly, the Court concludes that plaintiffs' claim does not implicate existing or contemplated federal regulations defining the terms "healthy" and "natural" so as to raise a federal question under *Grable*.

## CONCLUSION

For the reasons stated above, the Court concludes that plaintiffs' claim does not suffice under *Grable* to support federal question jurisdiction. Accordingly, plaintiffs' motion to remand this case to the Superior Court of the District of Columbia will be granted. A separate Order (ECF No. 16) accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   February 22, 2017